DEANNA L. FORBUSH
Nevada Bar No. 6646
dforbush@foxrothschild.com
COLLEEN E. MCCARTY
Nevada Bar No. 13186
cmccarty@foxrothschild.com
**FOX ROTHSCHILD LLP**
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
Telephone: (702) 262-6899
Facsimile: (702) 597-5503

MATTHEW J. HOFFER (MI P70495)*
Matt@BradShaferLaw.com
ZACHARY M. YOUNGSMA (MI P84148)**
Zack@BradShaferLaw.com
**SHAFER & ASSOCIATES, P.C.**
3800 Capital City Boulevard, Suite 2
Lansing, Michigan 48906
Telephone: (517) 886-6560
*Pro Hac Admission Pending*
** *Admission Application to this Court Forthcoming*
Plaintiff, Cat's Meow of Vegas, LLC d/b/a Cat's
Meow

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| CAT'S MEOW OF VEGAS, LLC d/b/a Cat's Meow,<br><br>    Plaintiff,<br><br>    vs.<br><br>THE STATE OF NEVADA, COVID-19 MITIGATION AND MANAGEMENT TASK FORCE; STEVE SISOLAK, in his official capacity as Governor of Nevada; AARON FORD, in his official capacity as Attorney General of Nevada; BARBARA CEGAVSKE, in her official capacity as the Nevada Secretary of State; CITY OF LAS VEGAS; CAROLYN GOODMAN, in her official capacity as Mayor of the City of Las Vegas; ROBERT SUMMERFIELD, in his official capacity as Director of the City of Las Vegas Department of Planning; and CALEB CAGE, in his official capacity as Chairman of the COVID-19 Mitigation and Management Task Force,<br><br>    Defendants. | Case No.:<br><br>**PLAINTIFF'S VERIFIED COMPLAINT FOR EMERGENCY TEMPORARY RESTRAINING ORDER, PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF; DECLARATORY RELIEF; ATTORNEY FEES AND COSTS; AND NOMINAL DAMAGES**<br><br>**Pursuant To Temp. Gen. Order 2020-04; TELEPHONIC OR VIDEO ORAL ARGUMENT REQUESTED** |

**NOW COME** Cat's Meow of Vegas, LLC d/b/a Cat's Meow by and through its attorneys, and state for their complaint against all Defendants listed in the above Caption as follows:

## INTRODUCTION

1.     This is a civil action wherein Plaintiff prays for a declaratory judgment, nominal damages, attorney fees and costs, and both an immediate temporary restraining order ("TRO") and preliminary and permanent injunctive relief to restrain and enjoin the Defendants, as well as their agents, employees and representatives, from acting under the color of state law to deprive Plaintiff of its rights, privileges and immunities secured to it by the Constitutions of the United States of America and the great state of Nevada. Specifically, Plaintiff seeks to have this Court declare as unconstitutional on its face, and to enjoin, the specific aspects of the Nevada Governor's Declaration of Emergency Directive ("EO") Nos. 003, 21, and 33.

2.     Specifically, Plaintiff challenges the mandatory closure of "nightclubs" found in EO 003 and all subsequent EOs that do not permit "nightclubs" to reopen (hereafter, the "**Nightclub Order**"); the 25-foot floating buffer requirement found in EO 33 (hereafter, the "**Buffer Order**"); and the prohibition on karaoke found in the guidance accompanying EO 33 (hereafter, the "**Karaoke Order**," collectively with the Nightclub Order and the Buffer Order, the "**Orders**").

3.     Because the COVID-19 pandemic that has ravaged the world since First Quarter, 2020, and because various states of emergency have existed since at least mid-March, and because businesses were shuttered at the hands of various levels of government, and because, as governments permit businesses to reopen subject to varying requirements, Plaintiff brings this action on an emergency basis and will seek an immediate TRO as well as a preliminary and permanent injunction to prevent irreparable injury to its workers, business, and all their constitutional rights.

## JURISDICTION AND VENUE

4.     Jurisdiction is conferred on this Court for the resolution of the substantial constitutional questions presented here by virtue of 28 U.S.C. § 1331, 28 U.S.C. § 1343(a)(4), and 28 U.S.C. § 1343(a)(3), the latter of which provides, in pertinent part, that the district courts shall have original jurisdiction over any civil action authorized by law to be commenced by any person:

2

"To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States. . . ."

5.     Supplemental jurisdiction over state law claims is conferred upon this Court by 28 U.S.C. § 1367 as Plaintiff's state law claims are so related to those claims over which this Court has federal question jurisdiction that they form part of the same case or controversy.

6.     The statutory law which further authorizes the institution of this suit, and in particular the damage claims asserted herein, is 42 U.S.C. § 1983 which provides, in part, as follows:

"Every person who, under color of any statute, ordinance, regulation, custom or usage, or any State or Territory of the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . ."

7.     The prayer for declaratory relief is founded on Rule 57 of the Federal Rules of Civil Procedure as well as 28 U.S.C. § 2201, the latter of which provides that:

". . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. . . ."

8.     The jurisdiction of the Court to grant injunctive relief is conferred upon this Court by Rule 65 of the Federal Rules of Civil Procedure, and by 28 U.S.C. § 2202, the latter of which provides:

"Further necessary or proper relief on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment."

9.     Federal question jurisdiction for the request for attorney fees and costs is conferred by 42 U.S.C. § 1988.

10.     This suit is authorized by law to redress deprivations under color of state law of rights, privileges, and immunities secured by the First and Fourteenth Amendments to the United States Constitution; Article 1, Sections 8-9, & 24 of the Nevada Constitution; and Nev. Rev. Stat. ("NRS") §§ 41.031 and 41.0334(2)(b), and for declaratory and injunctive relief.

11. Venue in this Court is appropriate as the various acts complained of occurred, and the parties are located, within the State of Nevada and, therefore, the United States District Court for the District of Nevada.

## PARTIES

12. Cat's Meow of Vegas, LLC ("Cat's") is a Nevada Limited Liability Company duly organized and authorized to conduct business in the State of Nevada. Cat's does business as *Cat's Meow* at 450 Fremont Street, Suite 201 in Las Vegas, Nevada, which is located in Clark County, State of Nevada.

13. The State of Nevada—COVID-19 Mitigation and Management Task Force ("Task Force"), a State of Nevada Task Force formed by Governor Sisolak pursuant to NRS § 414. The Task Force has the authority to amend and enforce the Orders. Defendant Task Force is sued in its official capacity only.

14. Defendant Steve Sisolak is the Governor of Nevada. Governor Sisolak is responsible for issuing and enforcing the Orders. He is being sued in his official capacity only.

15. Defendant Aaron Ford is Nevada's Attorney General. Attorney General Ford is authorized to enforce and prosecute violations of the Orders. He is sued in his official capacity only.

16. Defendant Barbara Cegavske is the Nevada Secretary of State. Defendant Cegavske has the power, both personally and through her subordinates, to enforce the Orders. She is sued in her official capacity only.

17. Defendant City of Las Vegas (the "City") is a municipal government located within and chartered under the laws of the State of Nevada. Defendant City is not a home-rule City. Defendant City has the power to enforce the Orders. Defendant City of Las Vegas is sued in its official capacity only.

18. Defendant Carolyn Goodman is the Mayor of the City of Las Vegas. Defendant Goodman has the power, both personally and through her subordinates, to enforce the Orders. She is sued in her official capacity only.

115944755.v1

19.     Defendant Robert Summerfield is the Director of the City of Las Vegas Department of Planning. Defendant Summerfield has the power, both personally and through his subordinates, to enforce the Orders. He is sued in his official capacity only.

20.     City of Las Vegas Department of Planning is a Division of the City of Las Vegas. The Las Vegas Department of Planning has the power to enforce the Orders. Defendant Las Vegas Planning Department is sued in its official capacity only.

21.     Defendant Caleb Cage is the Chairman or COVID-19 Response Director of the COVID-19 Mitigation and Management Task Force. Defendant Cage has the power, both personally and through his subordinates, to enforce the Orders. He is sued in his official capacity only.

## RELEVANT EXECUTIVE ORDERS AND GUIDELINES

### *Relevant State Orders and Guidelines*

22.     On March 12, 2020, Governor Sisolak declared a state of emergency in response to the COVID-19 outbreak.

23.     A true and accurate copy of the March 12 State of Emergency Declaration discussed immediately above is attached hereto as **Exhibit A** and is hereby incorporated by reference as though fully set forth herein.

24.     Governor Sisolak noted that the Nevada Constitution gave him "[t]he supreme executive power of this State." Governor Sisolak "direct[ed] all state agencies to supplement the efforts of all impacted and threatened counties" and announced that he would "perform and exercise such other functions, powers, and duties as are necessary to promote and secure the safety and protection of the civilian population." Id.

25.     Five days later, on March 17, 2020, Governor Sisolak held a press conference and explained steps the State would be taking to mitigate the risks associated with COVID-19.

26.     A true and accurate copy of the March 17, 2020 Press Release is attached hereto as **Exhibit B** and is hereby incorporated by reference as though fully set forth herein.

27.     Three days later, Governor Sisolak issued EO 003 ("EO 003"), which, among other things, mandating the closure of all "Non-Essential Businesses."

5

115944755.v1

28. A true and accurate copy of EO 003 is attached hereto as **Exhibit C** and is hereby incorporated by reference as though fully set forth herein.

29. EO 003 identified "fitness establishments such as gyms and studios; aesthetic services such as beauty shops, barbershops, nail salons, tanning salons, and wax salons" as "non-essential businesses" "where the risk of transmission [of COVID-19] is high[.]"

30. EO 003 mandated the closure of, among other businesses, "live entertainment venues" and "nightclubs."

31. On March 20, 2020, Governor Sisolak in conjunction with Justin Luna of the Division of Emergency Management Homeland Security, issued Emergency Regulations adding to Chapter 414 of the Nevada Administrative Code. These Emergency Regulations or the Nightclub Regulation sought to distinguish between essential businesses and non-essential businesses to provide further guidance to EO 003.

32. A true and accurate copy of these Emergency Regulations is attached hereto as **Exhibit D** and is hereby incorporated by reference as though fully set forth herein.

33. The Emergency Regulations define "live entertainment venues, including theaters and adult entertainment establishments," "restaurant services providing in-house dining only," "pubs, wineries, bars, and breweries," and "nightclubs," among others, as non-essential businesses.

34. "Nightclub" is undefined by the Emergency Regulation and does not appear elsewhere in the Nevada Administrative Code.

35. Approximately a month later, on April 30, 2020, Governor Sisolak introduced the "Nevada United: Roadmap to Recovery" plan (the "Phased Plan") that outlined a phased approach to reopening Nevada businesses and industry.

36. A true and accurate copy of the Phased Plan is attached hereto as **Exhibit E** and is hereby incorporated by reference as though fully set forth herein.

37. Several days later, on May 7, 2020, Governor Sisolak issued EO 18 ("EO 18"), which amended the onsite dining at restaurants and food establishments prohibition of EO 003. EO 18 permitted restaurants and bars and taverns licensed to serve food to provide on-site dining so long as

115944755.v1

1   customers were socially distanced a minimum of 6-feet apart. EO 18 did not permit, among others,

2   nightclubs or entertainment venues to open.

3         38.    A true and accurate copy of EO 18 is attached hereto as **Exhibit F** and is hereby

4   incorporated by reference as though fully set forth herein.

5         39.    On May 28, 2020, Governor Sisolak promulgated EO 21 ("EO 21"), which permitted

6   bars, breweries, distilleries, and wineries not licensed to serve food, to open subject to, among other

7   restrictions, six-foot social distancing guidelines. EO 21, however, did not permit "nightclubs, day

8   clubs, brothels, [or] adult entertainment facilities" to open. To date, the section regarding "nightclubs,

9   day clubs, brothels, [or] adult entertainment facilities" of EO 21, Section 27, has not been rescinded.

10         40.    A true and accurate copy of EO 21 is attached hereto as **Exhibit G** and is hereby

11   incorporated by reference as though fully set forth herein.

12         41.    EO 21 further permitted, citing NRS § 414.060(3)(f), "local, city, and county

13   governments and state agencies to enforce this Directive[.]"

14         42.    Nevada operated under the Phased Plan from April until August when, on August 3rd,

15   2020, Governor Sisolak unveiled the "Road to Recovery: Moving to a New Normal" plan (the "New

16   Normal Plan"), which supplemented the Phased Plan by permitting a county by county approach to

17   reopening and providing targeted industry-specific mitigation practices based on the risk level of each

18   county.

19         43.    A true and accurate copy of the New Normal Plan is attached hereto as **Exhibit H** and

20   is hereby incorporated by reference as though fully set forth herein.

21         44.    Eleven days later, on August 14, 2020, Governor Sisolak issued EO 30 ("EO 30") which

22   "supplement[ed] [] the earlier phase-focused Nevada United: Roadmap to Recovery disease

23   management plan[.]"

24         45.    A true and accurate copy of EO 30 is attached hereto as **Exhibit I** and is hereby

25   incorporated by reference as though fully set forth herein.

26         46.    EO 30 created the "COVID-19 Mitigation and Management Task Force" to which

27   Governor Sisolak "delegated the authority to implement and enforce the provisions of the New Normal

28   Plan statewide and to amend it after consultation with the Nevada Governor." The Mitigation Task

7

Force is "authorized to adopt, modify, or reject a county's action plan" and "[w]here counties, or the businesses within a county, fail to comply with such action plans and/or fail to show improvement in applicable disease measurement criteria, as outlined in the New Normal Plan:. [sic] the Mitigation Task Force is hereby authorized to enact mitigation and enforcement measures in addition to the action plan pursuant to the mitigation levels set forth in the New Normal Plan." *See* EO 30, **Exhibit I**.

47.    EO 30 cites "NRS 414.060(3)(f)" as "provid[ing] that the administrative authority vested to the Governor in times of emergency may be delegated[.]"*See* EO 30, **Exhibit I**.

48.    EO 30, "[p]ursuant to NRS 414.060(3)(f)" authorized "all local, city, and county governments, and state agencies to enforce this Directive, the elements of the New Normal Plan and the interpretations and decisions of the Mitigation Task Force through any of the following means, but not limited to [sic] these: suspending licenses, revoking licenses, or issuing penalties for violating business, professional, liquor, tobacco, or gaming licenses issued by the local jurisdictions for actions that jeopardize the health, safety, and welfare of the public; or for conduct which may injuriously affect the public health, safety, or welfare; conduct that may be detrimental to the public peace, health, or morals; or any other applicable ordinance or requirement for such a license." *See* EO 30, **Exhibit I**.

49.    EO 30 states that it "shall remain in effect until terminated by a subsequent Directive" "or upon dissolution or lifting of the Declaration of Emergency."

50.    EO 30 provides that "in no case shall any local government restrictions or guidelines be mote [sic] permissive than the provisions authorized by this Directive" and adopts, by reference, the "LEAP guidelines" set forth by the "Declaration of Emergency Directives."

51.    On August 11, 2020, The Local Empowerment Advisory Panel (LEAP) updated its "Roadmap to Recovery for Nevada Industry-& Activity-Specific Guidance" (the "LEAP Guidance").

52.    A true and accurate copy of the LEAP Guidance is attached hereto as **Exhibit J** and is hereby incorporated by reference as though fully set forth herein.

53.    The LEAP Guidance requires six-foot social distancing for such businesses as body art and body piercing establishments, massage establishments, skincare establishments, and movie theaters, to name a few. *See* LEAP Guidance, **Exhibit J**.

54.     A little over a month later, on September 30, 2020, Governor Sisolak issued the EO 33 ("EO 33"). EO 33 did not supersede the prohibition on nightclubs opening found in paragraph 48 of EO 21 and specifically *excluded* from the prohibition, "ambient music to create or enhance a mood or atmosphere that is incidental or ancillary to the activity or location."

55.     A true and accurate copy of the EO 33 is attached hereto as **Exhibit K** and is hereby incorporated by reference as though fully set forth herein.

56.     EO 33 mandates that "[v]enues with a listed fire code capacity of fewer than 2,500 may permit public attendance at live events" but must limit attendance to "the lesser of 250 attendees or 50% of the gathering space's listed fire code capacity" and those presenting "live entertainment performances shall require all attendees to be seated" and "[v]enues hosting live entertainment performances shall maintain a minimum separation of at least 25 feet between the artists and the audience" (the "25-foot floating buffer" requirement). Id.

57.     The 25-foot floating buffer requirement "is applicable to performances subject to live entertainment taxes pursuant to NRS 368A" but does not "extend to ambient music to create or enhance a mood or atmosphere that is incidental or ancillary to the activity or location." Id.

58.     EO 33 defines "social distancing" as the "guidance promulgated by the United States Centers for Disease Control and Prevention, including without limitation, maintaining at least six feet of physical distancing from other individuals." Id.

59.     Houses of Worship are subject only to "social distancing requirements" as outlined in EO 33. House of Worship "[p]articipants, including leaders and staff" must also "wear face coverings"; however, EO 33 does not preclude live entertainment, singing, or dancing at Houses of Worship. Id.

60.     Under EO 33, non-retail indoor and outdoor venues including bowling alleys, arcades, miniature golf courses, amusement parks, and theme parks are subject to the six-foot social distancing requirements. Id.

61.     Under EO 33, restaurants, breweries, food establishments, wineries, and distilleries are subject to the six-foot social distancing requirements. Id.

62.     Accompanying EO 33 was the "Nevada Guidance for Safe Gatherings, Celebrations, Ceremonies, and Events" (the "September Safe Gathering Guidance") that was first issued on

115944755.v1

1  September 29, 2020. The September Safe Gathering Guidance specifically states: "Karaoke singing

2  and open microphone events involving performances by individuals and visitors are not permitted."

3       63.    A true and accurate copy of the September Safe Gathering Guidance is attached hereto

4  as **Exhibit L** and is hereby incorporated by reference as though fully set forth herein.

5       64.    On October 15, 2020, the Governor revised the September Safe Gathering Guidance

6  (the "October Safe Gathering Guidance"). The October Safe Gathering Guidance maintained the

7  prohibition on karaoke singing and open microphone events.

8       65.    A true and accurate copy of the October Safe Gathering Guidance is attached hereto as

9  **Exhibit M** and is hereby incorporated by reference as though fully set forth herein.

10 ***Relevant Portions of NRS § 368A***

11      66.    NRS § 368A.090 defines "live entertainment" as:

12 1. "Live entertainment" means any activity provided for pleasure, enjoyment, recreation, relaxation, diversion or other similar purpose by a person or persons who are physically present when providing that activity to a patron or group of patrons who are physically present.

14 2. The term:

(a) Includes, without limitation, any one or more of the following activities:

(1) Music or vocals provided by one or more professional or amateur musicians or vocalists;

(2) Dancing performed by one or more professional or amateur dancers or performers, including, without limitation, dancing performed by one or more persons who are nude or partially nude;

(3) Acting or drama provided by one or more professional or amateur actors or players;

(4) Acrobatics or stunts provided by one or more professional or amateur acrobats, performers or stunt persons;

(5) Animal stunts or performances induced by one or more animal handlers or trainers, except as otherwise provided in subparagraph (3) of paragraph (b);

(6) Athletic or sporting contests, events or exhibitions provided by one or more professional or amateur athletes, sportsmen or sportswomen;

(7) Comedy or magic provided by one or more professional or amateur comedians, magicians, illusionists, entertainers or performers;

(8) A show or production involving any combination of the activities described in subparagraphs (1) to (7), inclusive;

(9) A performance by a disc jockey who presents recorded music; and

(10) An escort who is escorting one or more persons at a location or locations in this State.

(b) Except as otherwise provided in subsection 3, ***excludes***, without limitation, any one or more of the following activities:

(1) Television, radio, closed circuit or Internet broadcasts of live entertainment;

***(2) Entertainment provided by a patron or patrons, including, without limitation, singing by patrons or dancing by or between patrons;***

115944755.v1

(3) Animal behaviors induced by animal trainers or caretakers primarily for the purpose of education and scientific research;

(4) An activity that is an uncompensated, spontaneous performance that is not longer than 20 minutes during a 60-minute period;

(5) An activity described in subparagraphs (1) to (8), inclusive, of paragraph (a) that does not constitute a performance, including, without limitation, go-go dancing; or

(6) Marketing or promotional activities, including, without limitation, dancing or singing that is for a period that does not exceed 20 minutes during a 60-minute period and that is associated with the serving of food and beverages.

3. The exclusions set forth in paragraph (b) of subsection 2 do not apply to an activity provided by a nonprofit religious, charitable, fraternal or other organization that qualifies as a tax-exempt organization pursuant to 26 U.S.C. § 501(c), or by a nonprofit corporation organized or existing under the provisions of chapter 82 of NRS, when the number of tickets to the activity offered for sale or other distribution is 15,000 or more.

4. As used in this section, "person who is nude or partially nude" means a natural person with any of the following less than completely or opaquely covered:

(a) His or her genitals;

(b) The pubic region; or

(c) A female breast below a point immediately above the top of the areola.

Nev. Rev. Stat. Ann. § 368A.090 (emphasis added).

***Relevant Portions of the City of Las Vegas Municipal Code***

67.     The City of Las Vegas' Municipal Code requires persons seeking to operate a "Nightclub" to obtain a nightclub license. *See* Las Vegas Municipal Code Ch. 6.39, *et seq.*, (the "Code").

68.     The Code defines a nightclub as:

an indoor or outdoor drinking, dancing, or entertainment establishment that does its primary business after dark, has a dance floor or open area free of tables and chairs that would allow has sound equipment to allow live or recorded music played for the purpose of dancing (whether or not dancing actually occurs). The operation of the establishment may (but is not required to) include any of the following: Onsite consumption of alcoholic beverages, a bar area, a fee for admittance, a promoter contracted to provide entertainment, and the sale of prepared food. In order to qualify as a nightclub, any sale of prepared food must be accessory to the primary business operation, and gross receipts from the sales thereof may not exceed gross receipts from the sales of alcoholic beverages. The term does not include an establishment that is licensed (or qualifies) as an erotic dance establishment under LVMC dancing or assembly occupancies, and Chapter 6.35 or a teenage-related establishment licensed under LVMC Chapter 6.80.

69.     A true and accurate copy of the Chapter 6.36 of the Las Vegas Municipal Code is attached hereto as **Exhibit N** and is hereby incorporated by reference as though fully set forth herein.

· 11

115944755.v1

## GENERAL ALLEGATIONS

70.     Cat's is a full-service bar, including alcohol service, open to the consenting adult public, which is in the business of, has presented, and desires to continue to present in the future, live karaoke production entertainment.

71.     Cat's strives to create a high energy and non-stop karaoke environment for its patrons. It provides patrons the opportunity to sing karaoke in a performative way with the end effect being a produced high-end karaoke experience.

72.     To that end, Cat's employs disc jockeys that play songs and mix music live—through the blending of songs and various beats—to enhance the production, showmanship, and entertainment value of the patron's karaoke performance.

73.     Cat's disk jockeys also perform by the live mixing of music from the disk jockey booth.

74.     Cat's employs high-energy emcees who perform and entertain the crowd in between patron karaoke acts, step in when the vibe/tone/tenor of the Cat's dips, perform karaoke acts, perform karaoke acts alongside patrons, and introduce the upcoming karaoke acts.

75.     Cat's provides patrons with props to use on stage as a part of their performance. Such props include, but are not limited to, microphones, musical instruments, clothing, wigs, bicycles, stuffed animals, and hula hoops.

76.     Cat's provides a stage that includes performance-enhancing lighting, visual (fog) effects, and sound effects.

77.     Cat's provides TV monitors throughout the premises that display the karaoke act in its fully produced fashion.

78.     Cat's live-streams via the internet the entertainment and performances occurring at Cat's, meaning Cat's' performances are viewable from anywhere in the world whenever Cat's is open.

79.     From July 9, 2020, through January 9, 2020, Cat's two live stream-web cameras were viewed over 2,900,000 times for an average view time of between 5:06 and 7:38 minutes each. In just the 44 days Cat's opened from May through July of 2020, Cat's had 22,117 people enter its business.

80.     The internet is a channel and/or an instrumentality of interstate commerce.

115944755.v1

81.     Livestreaming via the internet places Cat's' performances and entertainment into the channels and/or instrumentalities of interstate commerce.

82.     The Orders prevent Cat's' entertainment and performances from being live-streamed over the internet.

83.     Cat's has an impact on the local economy by, among other things, locally sourcing alcoholic and non-alcoholic beverages; popcorn; employees and talent; props; and repair services.

84.     Cat's pays taxes that benefit all levels of government.

85.     Cat's has, since January of 2020, paid the Live Entertainment Tax found in NRS § 368A.

86.     Prior to its closure, on the February 21, 2020, payroll, Cat's employed 41 persons.

87.     Cat's presents lawful entertainment in conformity with its various licenses, permits, and/or government approvals, including, but not limited to:

      a.     A Nightclub License (License #: G67-03820) issued by the City of Las Vegas;

      b.     A Tavern-Limited License (License #: L67-00127) issued by the City of Las Vegas;

      c.     A Health Permit for two bars issued by the State of Nevada; and

      d.     A Tobacco Retail Dealer's License issued by the State of Nevada.

88.     On March 20, 2020, Cat's closed for business pursuant to EO 003.

89.     On May 29, 2020, pursuant to EO 21, Cat's reopened for business as a Tavern

90.     The City of Las Vegas, through Dereck Hibbler, under the authority delegated from the Governor under his various EOs, twice cited Cat's for engaging in "nightclub activities."

91.     On July 3, 2020, Mr. Hibbler of the Compliance and Enforcement Division of the City of Las Vegas Department of Planning's Business Licensing Division issued Cat's a citation for "engag[ing] in nightclub activity in violation of Governor Sisolak's Declaration of Emergency Directive 021 Phase Two Reopening Plan, Section 27(1) in violation of NRS 202.450" (the "July 3 Citation").

92.     A true and accurate copy of the July 3 Citation is attached hereto as **Exhibit O** and is hereby incorporated by reference as though fully set forth herein.

115944755.v1

93.     Less than 10 days later, On July 10, 2020, Mr. Hibbler again cited Cat's for the same cause (the "July 10 Citation").

94.     A true and accurate copy of the July 10 Citation is attached hereto as **Exhibit P** and is hereby incorporated by reference as though fully set forth herein.

95.     Thereafter, on July 12, 2020, Cat's ceased business operations and has been closed to the public since.

96.     In order to be able to contest the violations, Cat's was required to agree to a binding quasi-arbitration administrative proceeding to determine any fines arising out of this claimed violation. There is no right to appeal any ruling emanating from this quasi-arbitration proceeding.

97.     On August 29, 2020, while live entertainment was still prohibited under, among others, EO 003, Governor Sisolak and his wife dined at Monzu Italian Oven + Bar which featured a three-piece jazz band and singer entertaining diners in contradiction to the Governor's previous EOs.

98.     A true and accurate copy of the KTNV Las Vegas' news report is attached hereto as **Exhibit Q** and is hereby incorporated by reference as though fully set forth herein.

99.     A news report including video footage of Governor Sisolak at the restaurant just feet from the jazz band can be found at https://youtu.be/ARBBNlvMeBI (last visited Oct. 25, 2020).

100.    Shortly thereafter, the Governor addressed Nevadans regarding the video and stated: "Ambient music, as it's called, where people do not go buy a ticket to go to that, where people do not pay an admission, where that's not the purpose of the business, is allowed in a restaurant." *See* https://youtu.be/n71ZR5hjFGw (last visited Oct. 25, 2020).

101.    Local Las Vegas news has reported that the City has been citing Karaoke bars as nightclubs but does not cite karaoke venues "that have only private suits with a very limited number of guests permitted" (the "Local News' Karaoke Report").

102.    A true and accurate copy of the Local News' Karaoke Report is attached hereto as **Exhibit R** and is hereby incorporated by reference as though fully set forth herein.

103.    The Centers for Disease Control ("CDC") continues to recommend only a six-foot buffer or social distance to slow the spread of the disease. Social Distancing, CDC,

115944755.v1

1   https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html, (last visited

2   Oct. 19, 2020).

3        104.    In order to keep its employees and patrons safe, Cat's has implemented the following

4   safety and COVID-19 risk reduction measures:

5            a. Full compliance with the CDC recommended six-foot social distancing requirements

6       for guest tables;

7            b. Full compliance with the CDC recommended six-foot social distancing requirement

8       for patrons when moving about the premises;

9            c. Encouraging patrons to remain seated whenever possible;

10           d. Providing PPE including face coverings and hand sanitizer for all employees;

11           e. Requiring patrons to wear face coverings at all times except for drinking and

12      performing on the stage;

13           f. Full compliance with all risk reduction and safety guidelines promulgated by the State

14      of Nevada, its agencies and departments, as well as the City of Las Vegas and its agencies and

15      departments;

16           g. Removing the microphones and/or using four microphones on a rotational basis

17      where the used microphone(s) is placed in an ultraviolet lightbox and sprayed with an

18      industrial-strength sanitizing solution prior to being used by another patron; and

19           h. Installation of plastic sheeting around the stage.

## COUNT I

### THE ORDERS VIOLATE THE FIRST AMENDMENT

### OF THE UNITED STATES CONSTITUTION

23       105.    Plaintiff incorporates herein by reference each and every paragraph above as though

24   fully set forth herein.

25       106.    In asserting its First Amendment challenges to the Orders, Plaintiff not only asserts its

26   own rights, but also the rights of its owners, employees, and patrons, who perform on the premises.

27       107.    The Orders are contrary to the First Amendment on their face, and as applied for

28   numerous and various reasons, including, but not limited to, the fact that:

15

a. They are content-based restrictions on speech and expression;

b. They violate individuals' right to association;

c. They effectuate an impermissible prior restraints on speech, expression, and association;

d. They are, even if viewed as content-neutral, not the least restrictive means of achieving the government's regulatory objectives and otherwise fail intermediate scrutiny;

e. They unduly, impermissibly, and unconstitutionally restrict the ability of individuals and businesses to engage in First Amendment protected activities;

f. They arbitrarily deprive Plaintiff of its First Amendment rights in violation of the substantive due process component of the Fourteenth Amendment;

g. They impermissibly single out First Amendment protected businesses and prevent them from reopening without justification;

h. They violate the doctrine of unconstitutional conditions;

i. They infringe on individuals' right to earn profit from protected speech, expression, and association;

j. They are unconstitutionally vague and ambiguous under the vagueness standards for matters impacting speech and expression; and

k. They are impermissibly and substantially overbroad judged in relation to their plainly legitimate sweep.

108.    As a direct and proximate result of the unconstitutional aspects of the Orders Plaintiff, its interests, owners, employees, and entertainers who perform thereon have suffered and will continue to suffer irreparable injuries, including, but not limited to, financial ruin, business ruination, loss of good will and reputation, and the inability to present protected First Amendment entertainment, in violation of the First Amendment.

109.    Under this Cause of Action, Plaintiff seeks declaratory and injunctive relief against all Defendants to prevent further deprivation.

115944755.v1

110.   Under this Cause of Action, Plaintiff also seeks nominal damages for Defendants' violations of the constitutional rights of Plaintiff, its employees, and its patrons.

## COUNT II

## THE ORDERS VIOLATES THE FOURTEENTH AMENDMENT

111.   Plaintiff incorporates herein by reference each and every paragraph above as though fully set forth herein.

112.   The Orders violate and are contrary to the rights secured to Plaintiff under the Fourteenth Amendment on its face and as applied for numerous and various reasons, including, but not limited to:

a. They treat similarly situated persons and businesses differently without justification, by, for example, permitting non-constitutionally protected entities to resume business operations while prohibiting Plaintiff from reopening and/or from reopening subject to the six-foot social distancing requirements of other similar businesses and not the 25-foot floating buffer requirements imposed by the Buffer Order;

b. They treat differently the class of persons desirous of using props, stage lighting, and visual effects to engage in protected expression from others similarly situated;

c. They treat differently persons desiring to engage in public karaoke performances and businesses offering karaoke performances from others similarly situated;

d. They violate Plaintiff's fundamental right to operate a lawful business pursuant to the Occupational Liberty Clause of the Fourteenth Amendment;

e. They deprive Plaintiff of its property interest in the profits of its business, in violation of the Fourteenth Amendment;

f. They arbitrarily deprive Plaintiff, its owners, employees, and patrons who perform thereat of their constitutional rights to free speech and expression in violation of the substantive due process component of the Fourteenth Amendment;

g. They deprived Plaintiff of its property interests in its businesses and profits therefrom without appropriate procedural due process;

17

h. They deprived Plaintiff of its various liberty and property interests without appropriate process including notice and an opportunity to be heard; and

i. They deprive Plaintiff of its various liberty and property interests without a post-deprivation hearing or the ability to participate in the reopening process.

113. As a direct and proximate result of the unconstitutional aspects of the Orders, Plaintiff, its interests, owners, employees, and patrons who perform thereon have suffered and will continue to suffer irreparable injuries, including, but not limited to, financial ruin, business ruination, loss of good will and reputation, and the inability to present constitutionally protected entertainment, in violation of the rights protected by the Fourteenth Amendment.

114. Under this Cause of Action, Plaintiff seeks declaratory and injunctive relief against all Defendants to prevent further deprivation.

115. Under this Cause of Action, Plaintiff also seeks nominal damages for Defendants' violations of the constitutional rights of Plaintiff, its employees, and its patrons.

## COUNT III

## THE ORDERS VIOLATE ART. I, § 8, CL. 3

## OF THE UNITED STATES CONSTITUTION

116. Plaintiff incorporates herein by reference each and every paragraph above as though fully set forth herein.

117. The Orders place an undue burden on interstate commerce and thus violate the Art. I, Sec. 8, cl. 3, the "Commerce Clause" of the United States Constitution for numerous and various reasons, including, but not limited to, the fact that:

a. Individually and collectively, the Orders impose burdens on interstate commerce that are not justified or outweighed by legitimate local benefits; and

b. Individually and collectively, the Orders prevent Plaintiff's entertainment from being live-streamed in interstate commerce.

118. Under this Cause of Action, Plaintiff seeks declaratory and injunctive relief against all Defendants to prevent further deprivation.

115944755.v1

119.   Under this Cause of Action, Plaintiff also seeks nominal damages for Defendants' violations of the constitutional rights of Plaintiff, its employees, and its patrons.

## COUNT IV

## THE ORDERS VIOLATE ART. 1, SEC. 9 OF THE NEVADA CONSTITUTION

120.   Plaintiff incorporates herein by reference each and every paragraph above as though fully set forth herein.

121.   In asserting their Art. I, Sec. 9 challenges to the Orders, Plaintiff not only asserts its own rights, but also the rights of their owners, employees, and patrons, who work and perform on its premises.

122.   The Orders are contrary to the Art. 1, Sec. 9 of the Nevada Constitution on its face and as applied  for numerous and various reasons, including, but not limited to, the fact that:

a. They are content-based restrictions on speech and expression;

b. They violate individuals' right to association;

c. They effectuate an impermissible prior restraints on speech, expression, and association;

d. They are, even if viewed as content-neutral, not the least restrictive means of achieving the government's regulatory objectives and otherwise fail intermediate scrutiny;

e. They unduly, impermissibly, and unconstitutionally restrict the ability of individuals and businesses to engage in protected activities;

f.  They impermissibly single out protected businesses and prevent them from reopening without justification;

g. They violate the doctrine of unconstitutional conditions;

h. They infringe on individuals' right to earn profit from protected speech, expression, and association; and

i. They are impermissibly and substantially overbroad judged in relation to their plainly legitimate sweep.

115944755.v1

123.     As a direct and proximate result of the unconstitutional aspects of the Orders, Plaintiff, its interests, owners, employees, and entertainers who perform thereon have suffered and will continue to suffer irreparable injuries, including, but not limited to, financial ruin, business ruination, loss of good will and reputation, and the inability to present protected entertainment, in violation of Art. 1, Sec. 9 of the Nevada Constitution.

124.     Under this Cause of Action, Plaintiff seeks declaratory and injunctive relief against all Defendants to prevent further deprivation.

125.     Under this Cause of Action, Plaintiff also seeks nominal damages for Defendants' violations of the constitutional rights of Plaintiff, its employees, and its patrons.

## COUNT V

## THE ORDERS VIOLATE THE DUE PROCESS AND EQUAL PROTECTION PROVISIONS

## OF THE NEVADA CONSTITUTION FOUND IN ART. 1, SECS. 8 & 24

## OF THE NEVADA CONSTITUTION

126.     Plaintiff incorporates herein by reference each and every paragraph above as though fully set forth herein.

127.     The Orders violate and are contrary to the rights secured to Plaintiff under Art. 1, Secs. 8 & 24 of the Nevada Constitution on its face and as applied for numerous and various reasons, including, but not limited to:

a. They treat similarly situated persons and businesses differently without justification, by, for example, permitting non-constitutionally protected to resume business operations while prohibiting Plaintiff from reopening and/or from reopening subject to the six-foot social distancing requirements of other similar businesses and not the 25-foot floating buffer requirements imposed by the Buffer Order;

b. They treat differently the class of persons desirous of using props, stage lighting, and visual effects to engage in protected expression from others similarly situated;

c. They treat differently persons desiring to engage in public karaoke performances and businesses offering karaoke performances from others similarly situated;

20

115944755.v1

d.  They deprive Plaintiff of its property interest in the profits of its business, in violation of the Fourteenth Amendment;

e. They arbitrarily deprive Plaintiff, its owners, employees, and patrons who perform thereat of their constitutional rights to free speech and expression in violation of substantive due process;

f. They deprived Plaintiff of its property interests in its businesses and profits therefrom without appropriate procedural due process;

g. They deprived Plaintiff of its various liberty and property interests without appropriate process including notice and an opportunity to be heard; and

h. They deprive Plaintiff of its various liberty and property interests without a post-deprivation hearing or the ability to participate in the reopening process.

128.    As a direct and proximate result of the unconstitutional aspects of the Orders, Plaintiff, its interests, owners, employees, and patrons who perform thereon have suffered and will continue to suffer irreparable injuries, including, but not limited to, financial ruin, business ruination, loss of good will and reputation, and the inability to present constitutionally protected entertainment, in violation of the rights protected by the Fourteenth Amendment.

129.    Under this Cause of Action, Plaintiff seeks declaratory and injunctive relief against all Defendants to prevent further deprivation.

130.    Under this Cause of Action, Plaintiff also seeks nominal damages for Defendants' violations of the constitutional rights of Plaintiff, its employees, and its patrons.

## **PRAYER FOR RELIEF**

**WHEREFORE**, for the foregoing reasons, Plaintiff respectfully requests this Honorable Court enter judgment against the Defendants, which would include:

A.    Entry of an order declaring the Orders and Nightclub Regulation to be unconstitutional on its face and as applied to Plaintiff;

B.    Entry of an immediate Temporary Restraining Order pursuant to Fed. R. Civ. P 65 and 28 U.S.C. § 2202 restraining the Defendants, including their officers, agents, employees,

21

115944755.v1

representatives, and any and all persons acting by, through, for, or on behalf of the Defendants, from enforcing and/or applying the Orders or Nightclub Regulation against Plaintiff;

        C.      Entry of a preliminary and permanent injunction pursuant to Fed. R. Civ. P 65 and 28 U.S.C. § 2202 restraining the Defendants, including their officers, agents, employees, representatives, and any and all persons acting by, through, for, or on behalf of the Defendants, from enforcing and/or applying the Orders or Nightclub Regulation against Plaintiff;

        D.      Entry of an order permitting Plaintiff to operate in accord with restrictions placed on similar businesses; namely, the use of face coverings, a capacity limit, six-foot social distancing, and/or the use of impermeable barriers;

        E.      Entry of an award of nominal damages against Defendants and in favor of Plaintiff;

        F.      Entry of an award of costs and attorney fees incurred herein pursuant to 42 U.S.C. § 1988; and

        G.      Such other and further relief as the Court deems just and proper.

Dated this 6th day of November, 2020.

Respectfully Submitted.

DEANNA L. FORBUSH
Nevada Bar No. 6646
dforbush@foxrothschild.com
COLLEEN E. MCCARTY
Nevada Bar No. 13186
cmccarty@foxrothschild.com
**Fox Rothschild LLP**
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
Telephone: (702) 262-6899
Facsimile: (702) 597-5503

MATTHEW J. HOFFER (MI P70495)
Matt@BradShaferLaw.com
ZACHARY M. YOUNGSMA (MI P84148)
Zack@BradShaferLaw.com
**SHAFER & ASSOCIATES, P.C.**
3800 Capital City Boulevard, Suite 2
Lansing, Michigan 48906
Telephone: (517) 886-6560
*Attorneys for Plaintiff, Cat's Meow of Vegas, LLC*

22

## VERIFICATION

I, Harry Mohney, do hereby certify under penalty of perjury as follows:

I am the Manager of Cat's Meow of Vegas, LLC d/b/a Cat's Meow, the Plaintiff in the above-entitled action.

I have read the foregoing verified complaint and know the contents thereof, and that the facts stated therein are true to the best of my knowledge, except those matters stated upon information and belief, and as to those matters, I believe them to be true.

Executed this 5th day of November, 2020.

HARRY MOHNEY

115944755.v1

24