DEANNA L. FORBUSH
Nevada Bar No. 6646
dforbush@foxrothschild.com
COLLEEN E. MCCARTY
Nevada Bar No. 13186
cmccarty@foxrothschild.com
**FOX ROTHSCHILD LLP**
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
Telephone: (702) 262-6899
Facsimile: (702) 597-5503

MATTHEW J. HOFFER (MI P70495)*
Matt@BradShaferLaw.com
ZACHARY M. YOUNGSMA Nevada Bar No. 15680
Zack@BradShaferLaw.com
**SHAFER & ASSOCIATES, P.C.**
3800 Capital City Boulevard, Suite 2
Lansing, Michigan 48906
Telephone: (517) 886-6560
*Admitted Pro Hac Vice*

Plaintiff, Cat's Meow of Vegas, LLC d/b/a Cat's Meow

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| CAT'S MEOW OF VEGAS, LLC d/b/a Cat's Meow,<br><br>Plaintiff,<br><br>vs.<br><br>THE STATE OF NEVADA, COVID-19 MITIGATION AND MANAGEMENT TASK FORCE; STEVE SISOLAK, in his official capacity as Governor of Nevada; AARON FORD, in his official capacity as Attorney General of Nevada; BARBARA CEGAVSKE, in her official capacity as the Nevada Secretary of State; CITY OF LAS VEGAS; CAROLYN GOODMAN, in her official capacity as Mayor of the City of Las Vegas; ROBERT SUMMERFIELD, in his official capacity as Director of the City of Las Vegas Department of Planning; and CALEB CAGE, in his official capacity as Chairman of the COVID-19 Mitigation and Management Task Force,<br><br>Defendants. | Case No.: 2:20-CV-02055-APG-NJK<br><br>**PLAINTIFF'S POST-EVIDENTIARY HEARING BRIEF** |

118925880.v1

# INTRODUCTION

Granting the requested injunction boils down to whether the Defendants (also, the "State") have met their burden of demonstrating that the Directive's restrictions are narrowly tailored. They have not. The restrictions amount to a one-size-fits-all ban that is grossly disproportionate to the interest served—as evinced by the lesser restrictive means applied to activities that are similar or present similar risk factors. Potently, however, the State admits the risk of COVID-19 transmission related to karaoke *could* be mitigated to acceptable levels, but doing so would be difficult to enforce. This justification has been uniformly rejected.

What is more, even if making the government's job easier was an appropriate way to satisfy narrow tailoring, the State fails to meet its burden. Since it is the government's burden to demonstrate a restriction on speech is narrowly tailored, it is not entitled to the assumptions necessary to buoy its proffered justification. For example, the State claims a lack of staffing while admitting it has not engaged all of its available resources.

Further casting doubt on the Directive's constitutionality, the Supreme Court has enjoined restrictions placed on religion during this Pandemic and has previously stated that Free Speech claims are entitled to the same protections afforded Free Exercise claims.

# ARGUMENT

## I. INTERMEDIATE SCRUTINY'S NARROW TAILORING STANDARD AND THE GOVERNMENTS' FAILURE TO MEET IT

### a. *Intermediate Scrutiny's Narrow Tailoring Requirements*

Any modern analysis of intermediate scrutiny's narrow tailoring standard must begin with McCullen v. Coakley, 573 U.S. 464 (2014), and McCutcheon v. Fed. Election Comm'n, 572 U.S. 185 (2014). These two cases complete the shift *away* from the deferential standard of United States v. Albertini, and to an enhanced obligation placed on the government. 472 U.S. 675, 689 (1985) (noting narrow tailoring is satisfied "so long as the neutral regulation promotes a substantial governmental interest that would be achieved less effectively absent the regulation.").[1] The Supreme Court recently

---

[1] Albertini is the case both Turner Broad. Sys., Inc. v. F.C.C., 520 U.S. 180, 213 (1997) and Turner

1

restated the current standard as: "the law must not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" Packingham v. North Carolina, 137 S. Ct. 1730, 1736 (2017) (quoting McCullen, 573 U.S. at 486). The Ninth Circuit added, this standard "has bite" and is "a demanding test" that requires a "searching inquiry" and "scrutinize[s] a challenged law with a healthy dose of skepticism," void of any "*Chevron*-like deference[.]" Duncan v. Becerra, 970 F.3d 1133, 1165, 67 (9th Cir. 2020).

Case law provides three principles to guide courts applying this standard. The first is fit. The means chosen must closely fit the government's goal. McCullen, 573 U.S. at 486; *see* McCutcheon, 572 U.S. at 218 (noting, "fit matters"). This "close fit" requirement serves as a backstop to prevent the government from too quickly choosing efficiency over speech. McCullen, 573 U.S. at 486. This Court expounded upon this "close fit" standard noting the chosen means "need not be the least restrictive" option, but "*the existence of 'obvious, less burdensome alternatives*' is a relevant consideration in determining whether the restriction meets this test." Ashley v. City of Las Vegas, No. 216-cv-02053, 2016 WL 6996999, at *3 (D. Nev. Nov. 27, 2016) (emphasis added) (quoting Berger v. City of Seattle, 569 F.3d 1029, 1041 (9th Cir. 2009)). Thus, under a skeptical review with bite, if there are obvious and less burdensome alternatives to the Directive's restrictions, the Directive fails.

The second is proportionality. The government's chosen means must be "'in proportion to the interest served[.]'" McCutcheon, 572 U.S. at 218 (quoting Bd. of Trustees of State Univ. of N.Y. v. Fox, 492 U.S. 469, 480 (1989)). Again, this Court has expounded upon this "proportionality" requirement noting this requirement is *not* satisfied "if a 'substantial portion of the burden on speech does not serve to advance its goals.'" Deans v. Las Vegas Clark Cty. Library Dist., 220 F. Supp. 3d 1058, 1064 (D. Nev. 2016) (quoting Ward v. Rock Against Racism, 491 U.S. 781, 799-800 (1989)). Thus, if a greater portion of the burden on speech does not serve to reduce the risk of COVID-19 transmission, the Directive cannot meet narrow tailoring.[2]

---

Broad. Sys., Inc. v. F.C.C., 512 U.S. 622, 662 (1994) cite for this obsolete deferential standard.

[2] These principles are supported throughout the United States Courts of Appeals' jurisprudence:
- The First Circuit notes McCullen, "placed particular weight on two key factors[:]" 1) "a mismatch between the narrowness of the problem and the breadth of the solution"—a "close fit"—

2

The final standard is the government's burden to "*demonstrate* that alternative measures that burden substantially less speech *would fail to achieve the government's interests*, not simply that the chosen route is *easier*." McCullen, 573 U.S. at 467 (2014) (emphasis added).

### b. *The Directive's Inability to Meet Those Requirements and the State's Failure to Carry Its Burden*

The Directive fails to meet the modern narrow tailoring requirements and the State has failed to demonstrate, beyond unsupported argument, how any of the lesser restrictive means it employs for any number of other businesses would fail to achieve its COVID-19 transmission reduction interest.

First, it is not a close fit for the Directives to completely ban karaoke, even though the danger of COVID-19 transmission stems only from the particulate expelled from a performer's mouth. The State readily admits this danger is sufficiently mitigated for the unmasked "ambiance" singer in a restaurant with 6-foot distancing regardless of whether that singer consumes alcohol prior to her

---

and 2) that the state had not "undertook to address the problem . . . with less intrusive tools readily available to it" as other jurisdictions had—again, a "close fit" requirement. Reddy v. Foster, 845 F.3d 493, 498 (1st Cir. 2017); *see also* Cutting v. City of Portland, Maine, 802 F.3d 79, 86 (1st Cir. 2015) (commenting that "seemingly tailored aspects of an untailored restriction on speech . . . do not automatically save such a restriction").

- The Second Circuit supports Ashley's less burdensome alternatives approach noting, "the government must show that it '*seriously undertook* to address the problem *with less intrusive tools readily available to it*.'" Agudath Israel of Am. v. Cuomo, No. 20-3572, 2020 WL 7691715, at *8 (2d Cir. Dec. 28, 2020) (quoting McCullen, 573 U.S. at 494); *see also* Kass v. City of New York, 864 F.3d 200, 208 (2d Cir. 2017) (quoting McCullen, 573 U.S. at 486) (A "restriction on free speech is narrowly tailored if it does not 'burden substantially more speech than is necessary to further the government's legitimate interests.'").
- The Third Circuit also echoes Ashley, as it requires: "the government must show that it tried or 'seriously considered substantially less restrictive alternatives,'" when "a restriction imposes a significant burden on speech[.]" Reilly v. City of Harrisburg, 790 F. App'x 468, 473 (3d Cir. 2019) (quoting Bruni v. City of Pittsburgh, 941 F.3d 73, 89 (3d Cir. 2019)).
- The Fourth Circuit noted McCullen, "makes it clear that intermediate scrutiny does indeed *require* the government to present *actual evidence* supporting its assertion that speech restriction does not burden substantially more speech than necessary; *argument unsupported by the evidence will not suffice to carry the government's burden*." Reynolds v. Middleton, 779 F.3d 222, 228–29 (4th Cir. 2015) (emphasis added).
- The Tenth Circuit notes McCullen, "expressly rejected the argument that the government could choose a particular means of achieving its interest merely because that method was easier to administer." Verlo v. Martinez, 820 F.3d 1113, 1137 (10th Cir. 2016).

3

performance. [Record, at p. 151:13-17]. Further, the State admits this danger is sufficiently mitigated in a bar airing the College Football National Championship where, again, the State admits fans are likely to be consuming alcohol unmasked, yelling, and talking loudly; thus, more closely. [Record, at pp. 70-71; 129-30]. But, for some reason, these risks are sufficiently mitigatable and mitigation measures are more easily enforced in those instances than in Cat's. A close fit for karaoke would be, for example, imposing any, or even all, of the restrictions applicable to those businesses. The karaoke ban is a matter of convenience; not a close fit.

Moreover, as Ashley noted, a strong indicator that the Directive lacks a close fit is the existence of obvious lesser restrictive options. In fact, the State employs those less burdensome alternatives for similar constitutionally protected entertainment venues, as noted in the preceding paragraph, as well as *non*-constitutionally protected businesses. For example, a person may sprint on a treadmill 6-feet from another, [ECF 1-11, at ECF p. 20], or bowl; get a haircut, a tattoo, or piercing; and watch a movie 2-feet away from another, with the use of a barrier. [Id., at ECF pp. 10, 33, 41; Record, at p. 62:9-15]. Further examples abound. *E.g.*, [Record, at p. 71:5-19 (distancing for bars serving alcohol with entertainment); p. 72:1-6 (capacity limits for smaller live entertainment venues); p. 73:11-17 ("certain conditions in place"—distancing and capacity, for unmasked, inebriated ambient singers); p. 105:15-20 (distancing, capacity, and masking for houses of worship)]. Yet, to achieve the same goal the State achieved with those businesses, the State bans karaoke—a convenient but spacious fit.

Second, when comparing the proportionality of the burden placed on entertainment as a whole to achieve COVID-19 reduction, karaoke is disproportionately burdened. College football may be shown in alcohol-serving establishments where the State admits patrons may be cheering, talking loudly, and remaining for extended periods of time—all risk factors the State identified at Cat's, [record, at pp. 70-71]—but the Directive subjects this form of entertainment to only capacity restrictions, a mask mandate, and 6-foot distancing. Likewise, COVID-19 transmission is reducible to acceptable levels when a performer, consuming alcohol, leaves the patron area, takes the stage, unmasks and, using a sanitized shared microphone, performs, and then returns to the patron area to continue imbibing in/at the same event venue or restaurant, while another performer takes the stage—

4

but not in Cat's. [Record, at pp. 71-74; 151:13-16]. This scenario can include any number of performers, so long as they are "professionals" and not "amateurs." [Id., at pp. 72-74].

Finally, the State has not demonstrated that alternative measures would fail to achieve its interest. In fact, the State demonstrated that lesser means in fact *would* sufficiently achieve its interests. Specifically, when asked "the risk of COVID-19 from karaoke could be mitigated to a degree at least comparable to the risk of a gym . . . right? As a matter of policy[.]" the State responded, "yes, that is true." [Record, at p. 74:11-17; *see also* [id., at p. 124:20-25 (noting, but for enforcement issues, it is possible].[3] In addition, for each risk factor the State identified, it could not provide a factual basis for the differences in restrictions placed on various businesses. For example, the State admitted length of time spent indoors is a COVID-19 risk factor, but also admitted it conducted no fact-finding as to how long a person spends at 1) a karaoke event; 2) a bar with ambient music; or 3) a gym. [Record, at p. 148-49; *see also* id., at p. 151:9-11]. Despite not having engaged in any fact-finding, however, the State concluded the only way to mitigate this risk for karaoke is to ban it.

The State has not met its burden and the Directive is loosely tailored.

## II. THE COURT'S QUESTION: WHETHER A STATE'S ABILITY TO ENFORCE OR POLICE RESTRICTIONS IS A LEGITIMATE CONCERN UPON WHICH A STATE MAY BASE ITS RESTRICTIONS IN THE CONTEXT OF A FIRST AMENDMENT CLAIM?

No. A restriction on speech is not narrowly tailored simply because it is easier for the government to enforce. "No," has been the Supreme Court's answer since at least 1939. And, "no" is how a sister court recently answered the same two assertions Nevada makes here.

### a. The Heart of the Court's Question: Can <u>Impossibility</u> of Enforcement Sufficiently Justify Restrictions on First Amendment Rights?

No. "No," was a sister court's answer to New Jersey's similar attempt in a prisoner rights case. Abdur-Raheem v. New Jersey Dep't of Corr., No. CV151743, 2017 WL 1050581 (D.N.J. Mar. 20,

---

[3] Also, when asked on direct examination whether karaoke could be effectively mitigated, the State stated, "I do not [believe it could be]." [Record, at p. 116:1-4]. The justification given for this statement, however, centered on "limitation of resources," "extensive enforcement," inability "to enforce other measures," and "the cost of enforcement[.]" [Id., at 116:17-23]. As explained below in Section II, these explanations are invalid reasons to justify infringements on fundamental rights.

5

2017). In Raheem, the plaintiff challenged, on First Amendment grounds, the constitutionality of a rule that prohibited prisoner phone calls to cellular phones for any reason. Id. at *2. Like Nevada here, [Record, at pp. 116:17-18; 119:13-14], New Jersey attempted to justify its rule, in part, by claiming "that there is no ready alternative to the Cellphone Rule," and its elimination "would place an 'astronomical' burden on the state[.]" Raheem, 2017 WL 1050581 at *14. The court rejected this justification, reasoning, "county jails *within* [New Jersey] do not have an absolute ban on calls to cellphones" and "the penal institutions of 49 other states, and the county penal institutions within [New Jersey] have all found alternatives." Id. The same reasoning rings true here. Nevada does not have an absolute ban on other forms of speech and expression, or religion, which have similar COVID-19 transmission risks, and could not point to a single other state that employs a complete ban on karaoke. [Record, at p. 150:6-9].

Again, just as Nevada does here, [Record, at p. 116:19-22], New Jersey attempted to justify its rule by urging it was necessary to permit enforcement of other rules. Raheem, 2017 WL 1050581, at *13 ("Defendants' justification for having the Cellphone Rule is in part because of their own inability to enforce other rules."). The court concluded that this justification "amounts to an argument that their own *lack of capacity* to prevent illegal activities warrants the prohibition of an arguably constitutionally protected act." Id. (emphasis added).

Here, unlike the "arguably" protected act of prisoners making calls to cell phones, Cat's karaoke is unquestionably protected by the First Amendment—a point the State has not once contested. The Raheem court went on to reject New Jersey's justification stating, "the Bill of Rights was created to place the affirmative burden on the government to enact *and enforce* laws in ways that *do not infringe upon the rights of any individual*[.]" Id. (emphasis added). The District of New Jersey, in a fringe case regarding an "arguably constitutionally protected act," unequivocally rejected the "inability to enforce" and "scarcity of resources" justifications Nevada attempts here. Id. Given that karaoke is unquestionably a protected act compared to the "arguably constitutionally protected act" of prison phone calls and given that narrow tailoring's standard "has bite," Raheem's conclusion is warranted here: justifying a restriction on speech on the basis that the state cannot enforce lesser

6

118925880.v1

restrictive means cannot carry the State's burden. Permitting otherwise would be "giving the government carte blanche to restrict people's liberties under the guise of protecting them." Duncan, 970 F.3d at 1168.

### b. Are the Antecedent Assumptions the State Made to Arrive at its "Enforceability" Argument Warranted?

No. The State's justification factually presupposes its inability to enforce lesser restrictive means. The record belies the facts necessary for this assumption—the State admitted it has not utilized its full enforcement capability. [Record, at p. 145:3-4; 17-20]. The State admitted that local law enforcement is empowered to enforce the Directive's restrictions, yet, and for whatever reason, the State has not enlisted this cohort's help.[4] [Record, at p. 145:17-20]. Thus, this "unenforceability" and "scantiness of resources" crises are of the State's own making, or, at best, premature.

Further, the State did not explain, with any specificity, how less restrictive means would be more difficult to enforce, *see* [record, at pp. 98-100; 105-06; *see also* id., at p. 143:1-4 (admitting it would be easier to enforce a physical barrier requirement than a distance requirement)], or why enforcement through Cat's various licenses would not work, while claiming enforcement through licensure is sufficient for other businesses. [Id., at pp. 90:10-15; 100; 125-28; 144-45]. What is more, Nevada currently permits ambient music, which it admits is a subjective standard that is difficult to enforce, yet ambient music is permitted—unmasked and within 25-feet of the audience. [Id., at pp.140-42]. And, the State permits "large venues" to self-police the restrictions placed on them, but will not permit Cat's to do the same. [Id., at p. 154:15-18].

Finally, even with this assumption, if this Court were to find Plaintiff is substantially likely to succeed on its constitutional challenges to the Directive, the law is clear: a state never has an interest in enforcing an unconstitutional law. KH Outdoor, LLC v. City of Trussville, 458 F.3d 1261, 1272 (11th Cir. 2006) ("[T]he city has no legitimate interest in enforcing an unconstitutional ordinance."); Gordon v. Holder, 721 F.3d 638, 653 (D.C. Cir. 2013) ("[E]nforcement of an unconstitutional law is

---

[4] As of Fiscal Year 2019/2020, the Las Vegas Metro Police Department had 3,300 sworn police officers. [Youngsma Decl., at ¶5].

7

118925880.v1

always contrary to public interest."). Thus, the State cannot assert, as justification for an unconstitutional law, its inability to enforce a constitutional one.

### c. Can Making the Government's Job Easier or More Efficient Justify Restricting First Amendment Rights?

No. McCullen squarely addressed this issue. In attempting to justify a law that required abortion protestors to remain 35-feet from the entrance to an abortion clinic, the government argued "fixed buffer zones would 'make our [the enforcing officials'] job so much easier.'" McCullen, 573 U.S. at 495. In rejecting this justification, the High Court jested: "[o]f course they would." Id. The Court then made clear that making the government's life easier does not satisfy narrow tailoring because "the prime objective of the First Amendment is not efficiency." Id. Impeding fundamental rights is supposed to be hard—this is precisely the reason why the narrow tailoring requirement "has bite" and requires a demanding and skeptical review. Duncan, 970 F.3d at 1165.

McCullen, recognized what Schneider v. State of New Jersey, Town of Irvington started nearly a century ago: choosing the path of least resistance for the sake of ease can never meet the narrow tailoring standard. 308 U.S. 147 (1939). In Schneider, various plaintiffs challenged several municipalities' ordinances that prohibited distributing handbills in various public places. Id. at 154. The Court addressed an ordinance that required canvassers to receive a police officer's preapproval of the canvassed literature before distributing it. Id. at 163-64. The city justified this requirement on the basis that it had an interest in preventing fraud and the means chosen were the most efficient. Id. at 164. Rejecting this, the Court stated:

> If it is said that these means are less efficient and convenient than bestowal of power on police authorities to decide what information may be disseminated from house to house, and who may impart the information, the answer is that *considerations of this sort do not empower a municipality to abridge freedom of speech* and press.

Id. at 164 (emphasis added). The "less efficient and convenient" means mentioned were the Court's lesser restrictive hypotheticals of catching and punishing the trespassers and fraudsters. Id. Since 1939, courts of all levels have been striking down infringements on fundamental rights where the

8

government's justification amounts to enforcing lesser restrictive means would be hard.[5]

### III. THE FREE SPEECH CLAUSE IS ENTITLED TO PROTECTIONS EQUAL TO THOSE AFFORDED TO THE FREE EXERCISE CLAUSE

Though speech and religion may be protected "by quite different mechanism[s]," Lee v. Weisman, 505 U.S. 577, 591 (1992), neither is favored over the other such that both are protected equally and with the same force. Prince v. Massachusetts, 321 U.S. 158, 164 (1944). In Prince, Massachusetts convicted a Jehovah's Witness of violating its child labor laws. Prince, 321 U.S. at 159-60. The plaintiff conceded her free speech claim but argued that the Free Exercise Clause afforded her greater protections. Id. at 164. The High Court rejected that argument stating, "it may be doubted that any of the great liberties insured by the First Article can be given higher place than the others. All have preferred position in our basic scheme." Id. The Court continued acknowledging differences in the two clauses, but concluded, "they have unity in the charter's prime place because they have unity in their human sources and functionings." Id. at 164-65. Indeed, even more modern Justices have recognized this notion: "The right to free exercise was a substantive guarantee of individual liberty, no less important than the right to free speech or the right to just compensation for the taking of property." City of Boerne v. Flores, 521 U.S. 507, 563 (1997) (O'Connor and Breyer, JJ., dissenting) (superseded by statute as stated in Holt v. Hobbs, 574 U.S. 352 (2015)); Id. at 564-65 (emphasis added) ("Given the centrality of freedom of speech and religion to the American concept of personal liberty, it is altogether reasonable to conclude that *both should be treated with the highest degree of respect*.).

Thus, the State may not, at least constitutionally, treat religion any different than Cat's expression.

///

---

[5] *E.g.*, Stanley v. Georgia, 394 U.S. 557, 567-68 (1969) (rejecting an argument that possession of obscene material could be justified as an incident under the statutory scheme prohibiting distribution, the Supreme Court stated the restriction on privately possessed obscenity "may not be justified by the need to ease the administration of otherwise valid criminal laws") (other citations omitted); O'Clair v. United States, 470 F.2d 1199, 1204 (1st Cir. 1972) (noting "it is a fundamental principle of constitutional law requiring no citation that administrative convenience cannot justify infringement on constitutional rights").

9

# CONCLUSION

WHEREFORE, for the reasons stated above, Cat's respectfully requests this Honorable Court enter a Preliminary Injunction barring enforcement of the Directives as originally requested.

Dated: January 25, 2021

>  */s/ Deanna L. Forbush*
> DEANNA L. FORBUSH
> Nevada Bar No. 6646
> dforbush@foxrothschild.com
> COLLEEN E. MCCARTY
> Nevada Bar No. 13186
> cmccarty@foxrothschild.com
> **Fox Rothschild LLP**
> 1980 Festival Plaza Drive, Suite 700
> Las Vegas, Nevada 89135
>
>
> */s/ Matthew J. Hoffer*
> MATTHEW J. HOFFER (MI P70495)*
> Matt@BradShaferLaw.com
> ZACHARY M. YOUNGSMA
> Nevada Bar No. 15680
> Zack@BradShaferLaw.com
> **SHAFER & ASSOCIATES, P.C.**
> 3800 Capital City Boulevard, Suite 2
> Lansing, Michigan 48906
> *Admitted Pro Hac Vice*
>
> *Attorneys for Plaintiff*

118925880.v1

# CERTIFICATE OF SERVICE

I hereby certify that on January 25, 2021, copies of **PLAINTIFF'S POST-EVIDENTIARY HEARING BRIEF** was served via the Court's CM/ECF system as follows:

Bryan K. Scott, Esq.
Jeffrey L. Galliher, Esq.
495 S. Main Street, 6th Floor
Las Vegas, NV 89101
*Attorneys for City of Las Vegas,*
*Carolyn Goodman, and Robert Summerfield*

Aaron D. Ford, Esq.
Steve Shevorski, Esq.
Craig Newby, Esq.
Keil B. Ireland, Esq.
Office of the Attorney General
555 E. Washington Avenue, Suite 3900
Las Vegas, NV 89101
*Attorneys for the State of Nevada, Covid-19 Mitigation and Management Task Force, Steve Sisolak, Aaron Ford, Barbara Cegavske, and Caleb Cage*

*/s/ Zachary M. Youngsma*
Zachary M. Youngsma (NV 15680)
**SHAFER & ASSOCIATES, P.C.**

11

118925880.v1